**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 5 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JUSTINO HERNANDEZ-
DOMINGUEZ,

    Defendant-Appellant.

No. 99-3305
(D.C. No. 98-40116-02-RDR)
(Dist. Kan.)

**ORDER AND JUDGMENT***

Before **EBEL** and **BRISCOE**, Circuit Judges and **COOK**, Senior District Judge.**

After a jury trial, Appellant Justino Hernandez-Dominguez ("Dominguez") was convicted of possession with intent to distribute and conspiracy with intent to distribute approximately 1,992 grams of a mixture containing methamphetamine. Dominguez now appeals the district court's denials of his motion to suppress and

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

**The Honorable H. Dale Cook, Senior District Judge, United States District Court for the Northern District of Oklahoma, sitting by designation.

his motion for judgment of acquittal, arrest of judgment, and new trial. We affirm.

## BACKGROUND

On October 23, 1998, Dominguez and Ivan Hernandez-Mercado ("Mercado") were stopped for a traffic violation on Interstate 70 in Lincoln County, Kansas. The officer had observed the vehicle crossing the center line of the highway three times. Upon request, Mercado, the driver of the car, provided the officer with his license, registration, and proof of insurance. The officer spoke to the two men in English and Spanish.[1] Mercado spoke English and Spanish when responding to the officer's questions, and the officer testified that he did not have problems communicating with Mercado. The officer spoke mostly Spanish when communicating with Dominguez, who seemed to have more trouble speaking English.

The officer had Mercado sit in his car while he ran checks on Mercado's license and verified that Mercado was the owner of the vehicle. In response to the officer's questioning, Mercado told the officer that he and Dominguez had been in Los Angeles attending his cousin's wedding for two days, and were driving from Los Angeles to Atlanta. The officer noticed that Mercado appeared

---

[1]Although the officer who made the stop is not fluent in Spanish, he had taken 40 hours of "street Spanish" through the Kansas Highway Patrol Training Academy as well as several semesters of Spanish in high school.

nervous as he was asking him questions, and that Mercado was avoiding eye contact. When the officer asked Mercado where he worked, Mercado first said Los Angeles, and then changed his answer to Atlanta. Although Mercado told the officer he had been living in Atlanta for the past three months, he had a driver's license issued just three months earlier from Miami Beach, Florida. The officer asked Mercado if he had a green card and Mercado responded that he did not. The officer asked Mercado if he was an illegal alien, and Mercado indicated he was by nodding his head. At that point, dispatch advised the officer that Mercado had a valid license and no criminal history. The officer then told Mercado he could take a seat back in his own vehicle.

The officer had Dominguez take a seat in the patrol car. As this was happening, Mercado opened the trunk of his car without being asked to do so. The officer told Mercado to close the trunk. At this time, the officer noticed that both Mercado and Dominguez had pagers on their belts. The officer asked Dominguez for identification, and he responded that he had none. The officer asked Dominguez if he had a green card, and he responded that he did not. The officer ultimately obtained from Dominguez a Mexican federal ID card indicating his name and date of birth. A check revealed that there were no warrants under that name and date of birth. In response to the officer's questions, Dominguez stated that he and Mercado had been in Los Angeles visiting their friend Roberto,

but could not give a specific answer as to how many days they had been in Los Angeles.

The officer gave Mercado a warning for the traffic violations and asked if he could ask a few more questions before Mercado left. Mercado agreed. The officer obtained voluntary consent to search the car from both Dominguez and Mercado. During the search, the officer looked in the trunk and saw a spare battery, which raised his suspicions because he had heard of narcotics being smuggled in batteries. The officer then looked under the hood, pulled the top off of the battery, and found vacuum packed packages of methamphetamine. At that point, the officer placed Mercado and Dominguez under arrest and Mirandized them in English. They were transported to the Lincoln County Jail, where both were again Mirandized, this time in Spanish by a native Spanish speaking officer.

The two men were then interviewed separately. During those interviews, Mercado told the officers that he and Dominguez were working for someone in Los Angeles named La Bota. He also told them that on October 28, 1998, he and Dominguez met with an unknown individual in the parking lot of a Los Angeles mall, where their car battery was removed and replaced with a device that appeared to be a battery, but in fact contained a false compartment packed with methamphetamine. Mercado further told the officers that Dominguez was the main contact who "set the load of methamphetamine up." Mercado also told the

-4-

officers that he and Dominguez were supposed to get $3,000 for delivering the battery to La Bota's brother in Atlanta.

Dominguez separately told the officers that he knew of the agreement to transport the methamphetamine, and that he knew the designated recipient of the drugs. He also said that he had introduced Mercado to the recipient. Dominguez told the officers the name of the apartment complex where the recipient lived and showed them La Bota's number on his pager. He also explained to them how the false compartment worked on the battery. Dominguez further admitted to being present in the Los Angeles parking lot where the battery was removed from the car and replaced with the new battery containing the methamphetamine. Dominguez also told the officers that he was the one who actually owned the vehicle in which he and Mercado were traveling, and that the car was registered in Mercado's name only because Mercado had a valid driver's license and Dominguez did not.

On December 16, 1998, Dominguez and Mercado were indicted in the United States District Court for the District of Kansas. Count I of the indictment alleged that defendants Mercado and Dominguez knowingly and intentionally possessed, with the intent to distribute, approximately 1,992 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Count II alleged that on or about October 20, 1998, and

continuing until October 23, 1998, Mercado and Dominguez knowingly, willfully, and unlawfully conspired to possess with intent to distribute approximately 1,992 grams of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. § 846.

The defendants moved to suppress the drugs found in the vehicle and the statements they gave to the authorities, claiming they were illegally detained. The district court denied the motion. At Dominguez's jury trial,[2] the court submitted instructions to the jury that did not contain a venue instruction. Dominguez did not object to the lack of such an instruction. The jury found Dominguez guilty of both charges.

On June 11, 1999, Dominguez filed a motion for acquittal, arrest of judgment, and new trial, based upon the argument that the jury instructions did not contain a venue instruction. The district court denied that motion. Dominguez was sentenced to serve 188 months in prison on each count, with the time to be served concurrently.

---

[2]Mercado entered into a plea agreement with the government.

**DISCUSSION**

I.  Denial of Motion to Suppress

On appeal, Dominguez challenges the district court's denial of his motion to suppress the drugs found in the car and the statements he subsequently gave to the troopers.  Specifically, Dominguez argues that the officer should have released Mercado and Dominguez after he determined that Mercado's license was valid and there were no outstanding warrants.  He asserts that anything discovered after that point should have been suppressed as the result of an illegal detention.

> In reviewing the denial of a motion to suppress, we accept the factual findings of the district court unless they are clearly erroneous.  The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo.  We view the evidence in the light most favorable to the district court's determination.

United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997) (internal citations omitted).

Dominguez does not challenge the validity of the initial stop.  The stop was valid because it was based upon a traffic violation observed by the officer: failure to maintain a single lane of traffic under Kan. Stat. Ann. § 8-1522.  See also Whren v. United States, 517 U.S. 806 (1996).

An officer conducting a routine traffic stop may legitimately detain a driver while requesting a driver's license and vehicle registration, running a computer check, and issuing a citation.  See United States v. Hunnicutt, 135 F.3d 1345,

1349 (10th Cir. 1998). "Once the driver produces a valid license and proof that [he] is entitled to operate the car, the driver must be permitted to proceed." United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995). An officer may only lengthen the stop for questioning beyond that related to the initial stop if (1) the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter. See Hunnicutt, 135 F.3d at 1349. The government concedes that the officer's questioning of Dominguez, after he had determined that Mercado's license was valid, was beyond the scope of and unrelated to the initial stop. The government also concedes that the stop had not been transformed into a consensual encounter at this point. Thus, the question before us is whether the officer had an objectively reasonable and articulable suspicion that illegal activity had occurred or was occurring. We agree with the district court that he did.

The determination of whether investigative detention beyond the scope of the initial stop is supported by an objectively reasonable suspicion of illegal activity "does not depend upon any one factor but on the totality of the circumstances." Jones, 44 F.3d at 872 (citing United States v. Soto, 988 F.2d 1548, 1555 (10th Cir. 1993). We make this determination "with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." United States v. Mendez, 118 F.3d 1426, 1431 (10th

Cir. 1997). Here, while the officer was checking Mercado's license and registration, Mercado revealed that he was an illegal alien. Further detention of Mercado was therefore justified, as was the questioning of Dominguez. See United States v. Salinas-Calderon, 728 F.2d 1298, 1301 n.3 (10th Cir. 1984) (stating that "[a] state trooper [who has executed a lawful stop] has general investigatory authority to inquire into possible immigration violations"). Moreover, the officer testified to several factors that caused him to suspect illegal activity:

> [Mercado] was coming from Los Angeles, which is a major distribution point for the United States for narcotics. He had said he – he had told me that his cousin – he went out to see his cousin, who got married last week, but he had only been in L.A. for two days, and if they're driving all night, we're probably looking at two more days for their trip back. He was nervous and avoided eye contact as I spoke with him. He's up on I-70, which is a couple hundred miles out of his way. Didn't make sense to me why he would be clear up here for that route back home. They had pagers on their belts, a cell phone in the car.

Based on his experience,[3] the officer perceived these factors as "indicators of narcotics smuggling." Further contributing to the officer's suspicions were the

---

[3]The officer in question testified that he was experienced in narcotics interdiction and had conducted between 30 to 50 narcotics interdiction stops. His narcotics interdiction training included at least eight hours in the Highway Patrol basic training academy, and approximately two weeks of advanced highway criminal interdiction training.

facts that Mercado gave inconsistent statements about the city in which he worked, appeared nervous, and avoided eye contact.

The factors cited by the officer have been acknowledged as factors that can give rise to reasonable suspicion. Unusual or implausible travel plans, such as the very brief stay in Los Angeles despite the lengthy drive back to Atlanta, and the indirect path being taken to get to Atlanta, can contribute to a reasonable suspicion of illegal activity. See Mendez, 118 F.3d at 1431; United States v. Wood, 106 F.3d 942, 946-47 (10th Cir. 1997). Inconsistent statements may also give rise to reasonable suspicion of illegal activity. See Wood, 106 F.3d at 947 ("As with unusual travel plans, inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity."). The fact that travel commenced in a city such as Los Angeles, which is known for drug trafficking, may factor into the assessment. See United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986). Although Mercado's nervousness and failure to make eye contact is rarely the kind of factor that is dispositive in the inquiry, it can contribute to reasonable suspicion. See United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995); United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993). Pagers and cell phones, again, while not dispositive, may be indicative of illegal activity because they are known tools of

the drug trade.  See United States v. Slater, 971 F.2d 626, 637 (10th Cir. 1992)

(stating that a cell phone is a "recognized tool of the trade in drug dealing").

When viewed collectively, these factors, which were recognized prior to the

determination that Mercado's license was valid, support a finding of reasonable

suspicion of illegal activity.  The officer therefore had authority to extend the

traffic stop for further questioning, and, once the consent to search was given by

Mercado, the driver of the car, Dominguez, the passenger, could not challenge the

fruits of that search.[4]  See Rakas v. Illinois, 439 U.S. 128, 148-49 (1979); United

States v. Lewis, 24 F.3d 79, 81 (10th Cir. 1994).  In fact, the record indicates that

Dominguez himself consented to the search.  The district court did not err in

denying the motion to suppress.


II.    Denial of Motion for Judgment of Acquittal, Arrest of Judgment, and New
       Trial

Dominguez's other argument on appeal is that the district court erred by

failing to grant his motion for judgment of acquittal, arrest of judgment, and new

trial.  Dominguez argues that the failure to instruct the jury on the issue of venue

---

[4]On appeal, Dominguez did not raise more specific challenges to the
admission of the statements he made after being transported to the Lincoln
County jail.  We note, however, that Dominguez was properly Mirandized, and
that there is no credible evidence indicating that his statements to the officers
were involuntary.

resulted in the charging instructions failing to allege a crime, and that therefore the convictions and sentence should be vacated.

> We review the denial of a motion for judgment of acquittal de novo, viewing the evidence in the light most favorable to the government to determine if the jury could have found defendant guilty of the essential elements of the crime beyond a reasonable doubt. However, when the motion raises a question of venue, we alter the analysis somewhat, for unlike other substantive elements of the offense charged, the government need only prove venue by a preponderance of the evidence.

United States v. Byrne, 171 F.3d 1231, 1234 (10th Cir. 1999) (internal citations omitted). At oral argument, counsel for Dominguez admitted that he did not request a venue instruction, and that he consciously and deliberately did not object when he noticed that there was no venue instruction included in the proposed instructions.

"Although venue is a right of constitutional dimension, . . . [w]e have . . . applied a more relaxed standard for finding waiver of venue rights than for finding waivers of other constitutional rights in criminal trials. A defendant can waive venue rights by his inaction." United States v. Miller, 111 F.3d 747, 749-50 (10th Cir. 1997) (citing Wright, Federal Practice and Procedure § 306, at 219-220 (2d ed. 1982)). Dominguez's counsel admits that at the jury instruction conference, he recognized that the instructions did not contain a specific venue instruction, and that he then intentionally refrained from objecting to those instructions. We hold that Dominguez has therefore waived his right to contest

venue. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). Counsel's intentional failure to object to the lack of a venue instruction meets this definition.

We further note that the jury must have found that Dominguez possessed the methamphetamine described in the indictment in the District of Kansas. The evidence clearly showed that he and his co-defendant were stopped in Kansas in possession of the drugs. As the district court stated, "It is not theoretically possible that [the jury] found that defendant possessed the drugs in some other state (California, for example), but not in Kansas." With respect to the conspiracy charge, venue lies "either in the jurisdiction in which the conspiratorial agreement was formed or in any jurisdiction in which an overt act in furtherance of the conspiracy was committed by any of the conspirators." Miller, 111 F.3d at 753 n.8. The guilty verdict on the conspiracy count necessarily incorporated a finding that an overt act in furtherance of the conspiracy, the transporting of the drugs, was committed in Kansas. See United States v. Carter, 130 F.3d 1432, 1438-39 (10th Cir. 1997) (holding that venue for a conspiracy conviction was satisfied when the defendant was arrested in New Mexico in possession of the drugs because the jury necessarily found that an agreement existed when the defendant committed the overt act of transporting the

-13-

drugs). Therefore, venue was satisfied, and the district court did not err in denying the motion for judgment of acquittal, arrest of judgment, and new trial.

## CONCLUSION

The district court did not err in denying the motion to suppress and the motion for judgment of acquittal, arrest of judgment, and new trial. We AFFIRM the defendant's conviction.

ENTERED FOR THE COURT


David M. Ebel
Circuit Judge